UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MERIDIAN MEDICAL TECHNOLOGIES, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 4:23CV566 JAR |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL UNION NO. 688, | ) ) ) ) ) ) |
| Defendant. | ) ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on the Parties' cross Motions for Summary Judgment. ECF Nos. 22 and 23. These Motions are fully briefed and ready for disposition. For the reasons set forth below, the Court will grant Defendant's Motion for Summary Judgment [ECF No. 23] and deny Plaintiff's Motion Summary Judgment [ECF No. 22]. Therefore, the Arbitrator's Opinion and Award will be confirmed.

**Background**

Plaintiff Meridian Medical Technologies, Inc., and Defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union No. 688 are parties to a collective bargaining agreement. Defendant is the collective bargaining representative for certain employees of Defendant, including Cherie Miller. Miller was terminated from her position with Defendant and filed a grievance. The matter was submitted to arbitration, as provided in Article 20 of the collective bargaining agreement, and the arbitrator

sustained Miller's grievance. On May 1, 2023, Plaintiff filed this action to vacate the arbitration award entered in Defendant's favor, sustaining Miller's grievance.

The parties filed their respective Motions for Summary Judgment and Memorandum of Law in Support. The parties attached a Statement of Uncontroverted Material Facts in support of their respective motions, which each side responded to and noted their oppositions. Both sides timely filed their reply. The parties each attached exhibits, including the award of the arbitrator, the collective bargaining agreement, and portions of deposition testimony, with their respective memoranda.

## Facts

The following facts are taken from the parties' Statements of Uncontroverted Material Facts [ECF Nos. 25 and 27] and are undisputed, unless otherwise noted with a citation to the record:

<u>Background</u>

Plaintiff is a Delaware corporation with offices located in the County of St. Louis, Missouri. Plaintiff manufactures emergency use auto-injectors used in EpiPens and antidote treatment nerve agent injections ("ATNAAA") used by the United States Armed Forces to neutralize nerve agents. These products are both regulated and approved by the United States Food and Drug administration ("FDA"). Plaintiff's production process is thus subject to stringent FDA requirements.

Defendant is a labor organization and is the exclusive bargaining representative for some of Plaintiff's employees who work at the St. Louis locations, including an employee named Cherie Miller.

Plaintiff and Defendant were at all relevant times parties to a collective bargaining agreement ("CBA") for the period of April 1, 2019, through March 31, 2022. The CBA was in effect at all times relevant to this dispute, which arises from the termination of Miller on June 2, 2020, explained in further detail below.

Relevant Provisions of the Collective Bargaining Agreement

Article 9 of the CBA[1] establishes Plaintiff's "Management Rights," which include, but are not limited to, the right to "maintain efficiency, assign work and duties in accordance with the needs of the Company" and "to impose discipline up to and including the act of discharge."

Article 7 of the CBA establishes that all probationary employees, such as new employees, must complete Batch Records training during a ninety-day probationary period.

Article 11: Job Classification, Section 2, Training, states in relevant part:

Management will provide a comprehensive training program. All training will consist of written training, or online training, or training through observation, or hands-on training, or a combination of these as the particular training requires. At a minimum, the training will cover all CFRs, GMPs, SOPs, and Batch Records necessary for each member to complete his/her required tasks, based upon job classification.

Article 19: Discipline, Suspension, and Discharge, Section 1, states that Plaintiff "will not discipline, suspend, or discharge any bargaining unit employee without just cause." The same section further provides, in pertinent part:

No prior disciplinary action need be issued to an employee before they are suspended/discharged if the cause of such suspension/discharge is **dishonesty**, drunkenness, observed sleeping on the job while the employee is expected to be performing work, fighting on the job or otherwise violating the Company's Workplace Violence policy, **document alteration and/or falsification (including signing for work that was not performed by/checked by the colleague(s) who signed for the work),** three consecutive days of unreported absence (unless there are unusual/extenuating circumstances), possession and/or use of illegal drugs, willful or gross negligence or

---

[1] *See* ECF No. 25-3.

willful or gross misconduct that results in loss of Employer property or product, refusal to obey a direct work order, and any other serious misconduct (emphasis added).

Article 20 of the CBA establishes a grievance and arbitration procedure ("Grievance Procedure") created to resolve differences between Plaintiff and Defendant regarding the terms of the CBA itself. The Grievance Procedure culminates in arbitration before an arbitrator is appointed by the Federal Mediation and Conciliation Service. Article 20 of the CBA expressly establishes that "[t]he arbitrator shall have no authority to add to, detract from, or modify the provisions of [the CBA]."

Miller's Termination

Cherie Miller was employed with Plaintiff as a Qualified Trainer at the Brentwood facility in St. Louis County, Missouri. In addition to being a Qualified Trainer, Plaintiff was a Senior Technician on the third shift. Miller was responsible for training Kayla Harris, a probationary employee and trainee. Miller was discharged for non-compliance, specifically for completing fraudulent training on multiple on-the-job training ("OJT") forms on March 27, 2020, where there was no supporting documentation to show Miller was present for the training of Harris, or that Harris demonstrated proficiency for all of the tasks reflected on the OJT forms.

The Grievance Procedure

In June 2020, Miller timely filed a grievance, pursuant to Article 20 of the CBA, and Arbitrator Mark W. Suardi was appointed. On or about January 18 and March 31, 2022, the parties held separate arbitration hearings before Arbitrator Suardi regarding Miller's grievance. During the hearing, Plaintiff presented its case and argument that Miller submitted OJTs, which showed Harris completed five OJTs on a single day on March 27, 2020. Plaintiff also presented evidence that during its investigation, Miller admitted that she was not always present in the

4

same room as trainees during trainings. Plaintiff claims it had just cause to terminate Miller because she intentionally completed fraudulent training forms. In response, Defendant argued that it was possible to complete the five OTJ trainings in one day. Defendant also argued that in March 2020, Plaintiff was undergoing extreme understaffing, and the training Standard Operating Procedures ("SOPs") for specific processes were not being followed during that time. Kisa Mwenelupembe and Travis Davis, Miller's direct supervisors, were not called as witnesses by either of the parties. The parties submitted post-hearing briefs in support of their respective arguments during the arbitration hearings.

Arbitrator Suardi's Opinion and Award

On January 20, 2023, Arbitrator Suardi issued an Opinion and Award,[2] sustaining Miller's grievance and ordered Plaintiff to reinstate Miller to her former employment with full seniority, no loss of benefits and with back pay, less any amounts of compensation and earnings received by Miller subsequent to her termination.

In sustaining the grievance, Arbitrator Suardi found that Plaintiff failed to meet its burden of proving that Miller's preparation of the OJT Learning Unit submitted on March 27, 2020, concerning Harris was intentionally fraudulent or falsified.

Arbitrator Suardi began his analysis by acknowledging that:

> [Plaintiff] correctly argues that the nature of its business involves exacting standards of production which cannot be assured in the absence of properly trained employees…[and Plaintiff] is correct that the Learning Outcome Item Types and related verifications set forth in the proffered [records] constitute a reasonable exercise of managerial authority calculated to ensure that only fully qualified employees are…assigned to production duties…

---

[2] *See* ECF No. 25-1.

5

However, Arbitrator Suardi continued that prior to March 27, 2020, Plaintiff was short-handed, especially on the third shift, which resulted in "a rush to get people trained, employees frequently working double shifts, grievances over the forced movement of employees and some trainers receiving overtime in order to train new employees." Arbitrator Suardi found that Defendant's witnesses provided credible testimony that "they received instructions to sign off on documents and to train employees in a manner contrary to the actual process for OTJ training," and that "on the third shift it was acceptable for a qualified employee other than a qualified trainer to confirm a trainee's performance of particular OJT tasks." He also found that it was an acceptable practice to sign off on OJTs once a trainee was fully trained, not on each day throughout the training process. Arbitrator Suardi further drew an adverse inference against Plaintiff because it did not present Miller's direct supervisors, Mwenelupembe and Davis, who had pertinent information regarding the training practices at the time of Miller's termination. Arbitrator Suardi stated that the "failure of a party to call as a witness a person who is available to it and who should be in a position to contribute informed testimony may permit a neutral to infer that if the witness had been called, the testimony adduced would have been adverse to the position of the party who called them."

On May 1, 2023, Plaintiff filed this action to vacate the arbitration award entered in Defendant's favor, sustaining Miller's grievance.

## Legal Standards

<ins>Summary Judgment</ins>

"Summary judgment is proper where the evidence, when viewed in a light most favorable to the non-moving party, indicates that no genuine [dispute] of material fact exists and that the

6

moving party is entitled to judgment as a matter of law." *Davison v. City of Minneapolis, Minn.*, 490 F.3d 648, 654 (8th Cir. 2007); Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Id*. "The basic inquiry is whether it is so one-sided that one party must prevail as a matter of law." *Diesel Machinery, Inc. v. B.R. Lee Industries, Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (internal quotation marks and citation omitted). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citation omitted). Once the moving party has met its burden, "[t]he nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts and must come forward with specific facts showing that there is a genuine issue for trial." *Id*. (internal quotation marks and citation omitted).

Standard of Review of Arbitration Decision

In reviewing an arbitrator's decision under any theory, a court's review "is restricted by the great deference accorded arbitration awards." *Williams v. Nat'l Football League*, 582 F.3d 863, 883 (8th Cir. 2009); *see also Stark v. Sandberg, Phoenix, & von Gontard, P.C.*, 381 F.3d 793, 798 (8th Cir. 2004) ("When reviewing an arbitral award, courts accord 'an extraordinary level of deference' to the underlying award itself, because federal courts are not authorized to reconsider the merits of an arbitral award 'even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract.'" (citations omitted)); *Bhd. of Maint. of Way Employees v. Terminal R.R. Ass'n*, 307 F.3d 737, 739 (8th Cir. 2002) (noting the Court's

7

"scope of review of the arbitration award itself is among the narrowest known to the law"). "To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and *a court may not reject those findings simply because it disagrees with them*." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987) (emphasis added). A federal court may not set aside an arbitrator's decision based on "improvident, even silly, factfinding." *Nat'l Football League Players Ass'n on behalf of Peterson v. Nat'l Football League,* 831 F.3d 985, 996 (8th Cir. 2016), quoting *Major League Baseball Players Ass'n v. Garvey,* 532 U.S. 504, 509 (2001). Even if a court is convinced that the arbitrator committed serious error, the court must still confirm the award as long as the arbitrator "is even arguably construing or applying the contract." *Id.*; *see also, United Food & Commercial Workers' Union Local 655 v. St. John's Mercy Health Sys.*, 448 F.3d 1030, 1032 (8th Cir. 2006). Except in limited circumstances, a court must defer to the arbitrator's interpretation. *Misco*, 484 U.S. at 38.

>Under the Federal Arbitration Act (FAA), a court may only vacate an arbitration award:
>
>(1) where the award was procured by corruption, fraud, or undue means;
>
>(2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
>(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
>(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

In addition to the grounds enumerated in the FAA, the Eighth Circuit has recognized two "extremely narrow" extra-statutory bases for vacating an arbitration award where the award is

8

either completely irrational or manifests a disregard for the law. *Hoffman v. Cargill Inc.*, 236 F.3d 458, 461 (8th Cir. 2001); *see also Stark,* 381 F.3d at 798. "An arbitration decision may only be said to be irrational where it fails to draw its essence from the agreement, and an arbitration decision only manifests disregard for the law where the arbitrators clearly identify the applicable, governing law and then proceed to ignore it." *Hoffman*, 236 F.3d at 461–62. The Court cannot review the merits of the underlying dispute and is required to enforce the arbitrator's decision unless it fails to "draw[ ] its essence from the underlying collective bargaining agreement." *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960); *see also Turner v. United Steelworkers of Am., Local 812*, 581 F.3d 672, 675 (8th Cir. 2009).

**Discussion**

Plaintiff argues that the arbitration award should be vacated because it fails to draw its essence from the CBA, and it violates public policy. Defendant disagrees with Plaintiff, maintaining Arbitrator Suardi issued the award within his scope of authority, and therefore, the award must be enforced.

Essence of the CBA

Plaintiff argues that the arbitration award fails to draw its essence from the CBA in the following respects: First, Arbitrator Suardi modified the CBA by applying new obligations on Plaintiff, and second, he inappropriately applied an adverse inference against Plaintiff.

*Modification*

Plaintiff contends that Arbitrator Suardi exceeded his authority provided under the CBA by adding a heightened burden of proof upon Plaintiff that Miller's behavior was "intentionally fraudulent." Plaintiff argues that under Article 19 of the CBA, it is only required to establish that

9

Miller engaged in behavior that was either "dishonest" or involved "document alteration and/or falsification," which is defined as "signing for work that was not performed by/checked by the colleague(s) who signed for the work." *See* CBA, ECF 25-3 at p. 30. Plaintiff also points to Article 20 of the CBA, which states that the "arbitrator shall have no authority to add to; detract from or modify the provisions of this Agreement." *Id.* at pp. 32-33.

"An arbitrator's award draws its essence from the parties' agreement as long as it is derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention." *Williams*, 582 F.3d at 883. If an agreement's language is plain or "unmistakably clear," an arbitrator must enforce it as written, but if "the plain language of the parties' agreement is silent or ambiguous with respect to a disputed issue, an arbitrator is obliged to consider other relevant sources of the parties' intent." *Boise Cascade Corp. v. Paper Allied–Indus., Chem. & Energy Workers*, 309 F.3d 1075, 1082 (8th Cir. 2002). Courts have no authority to reconsider the merits of an arbitration award, even when the parties allege that the award rests on factual errors or on a misinterpretation of the underlying contract. *Inter–City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184, 187 (8th Cir. 1988) (acknowledging that "contract interpretation is left to the arbitrator"). The Eighth Circuit has explained that "[t]he bottom line is we will confirm the arbitrator's award even if we are convinced that the arbitrator committed serious error, so long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *McGrann v. First Albany Corp.*, 424 F.3d 743, 748 (8th Cir. 2005) (internal quotations, alteration and citation omitted).

Arbitrator Suardi defined the issue as: "Did [Plaintiff] have just cause to terminate [Miller], and if not what shall the remedy be?" *See* Award of Arbitrator, ECF No. 25-1 at p. 4.

He acknowledged that Article 19 of the CBA, in pertinent part, provided that no prior disciplinary action need be issued to an employee before he/she is suspended/discharged if the cause is "dishonesty," or "document alteration and/or falsification (including signing for work that was not performed by/checked by the colleague(s) who signed for the work)." *Id.* at p. 5. Arbitrator Suardi began his analysis by stating that Plaintiff's "charge of fraudulent misconduct presumes that [Miller's] actions were done knowingly and with an intent to deceive[,]" and the "[i]ntent to deceive is at the heart of every case involving fraudulent behavior and fraudulent documentation." *Id.* at p. 12. He found that Defendant produced credible testimony that employees, including Miller, "received instructions to sign off on documents and to train employees in a manner contrary to the actual process for OTJ training" from Plaintiff. *Id.* at p. 13. He determined:

> On a conflicted record, the preponderate evidence establishes that in March 2020 it was a common practice on the third shift for a qualified trainer to observe a trainee performing a task with another qualified employee; that it was a common practice which was known to supervisors to train or observe a trainee over a period of time before sign off; and that it was an acceptable practice to sign off on OJTs once a trainee was fully trained, not on each day throughout the training process.

*Id*. at p. 14.

There is no dispute between the parties that the CBA provides cause for an employee's discharge if the cause is "dishonesty," or "document alteration and/or falsification." *See* the CBA, ECF 25-3 at p. 30. The disagreement arises from Arbitrator Saudi's decision that Miller's actions do not qualify as "falsified" or "intentionally fraudulent." Plaintiff takes issue with his interpretation that "intentionally fraudulent" is synonymous to "dishonesty" or "falsification," whereas Defendant believes Arbitrator Saudi's interpretation draws from the essence of the CBA.

11

Dishonesty is not defined in the CBA, but the Court takes judicial notice of the common dictionary definition, according to Merriam-Webster,[3] as:

1: lack of honestly or integrity : disposition to **defraud** or **deceive**;

2. a dishonest act : **FRAUD** (emphasis added).

The Court further notes that misrepresentation under Missouri law "requires an intent to deceive." *United Fire & Cas. Co. v. Historic Pres. Trust*, 265 F.3d 722, 731 (8th Cir. 2001). There is no doubt that it is reasonable for one to infer that the underlying actions of being dishonest, false, or fraudulent stem from a basis of intent by the actor. Arbitrator Suardi's finding that Plaintiff failed to meet its burden of proving that Miller's preparation of the OJT's was "intentionally fraudulent or falsified" arguably construes the terms "dishonesty," or "document alteration and/or falsification" as the CBA permits. The Court finds that Arbitrator Suardi acted within the scope of his authority here and did not add to, detract from or modify the provisions of the CBA. His interpretation of the CBA is not "completely irrational or manifests a disregard for the law," which is a necessary finding for the relief Plaintiff requests. *See Hoffman*, 236 F.3d at 461.

*Adverse Inference*

Plaintiff next argues that Arbitrator Suardi inappropriately drew an adverse inference against it because Plaintiff did not present Miller's direct supervisors, Mwenelupembe and Davis. Defendant also did not call these witnesses. Arbitrator Suardi found that Mwenelupembe and Davis had pertinent information regarding the training practices at the time of Miller's termination and applied an adverse inference against Plaintiff based on the absence of their

---

[3] https://www.merriam-webster.com/dictionary/dishonesty (last visited: September 12, 2024).

testimony from Plaintiff's case. Arbitrator Suardi stated that the "failure of a party to call as a witness a person who is available to it and who should be in a position to contribute informed testimony may permit a neutral to infer that if the witness had been called, the testimony adduced would have been adverse to the position of the party who called them." *See* Award of Arbitrator, ECF No. 25-1 at p. 15.

When deciding an adverse inference issue, the Eighth Circuit has found that "it [is] significant which party had the burden of proof." *Boardman v. Nat'l Med. Enterprises*, 106 F.3d 840, 844 (8th Cir. 1997). The Court explained that "[d]rawing an adverse inference from the failure of a party to put on key witnesses relevant to some issue is most reasonable when it is the party with the burden of proof on that issue who fails to do so." *Id.*, citing *Kostelec v. State Farm Fire & Cas. Co.*, 64 F.3d 1220, 1228 (8th Cir. 1995).

Whether the adverse inference was appropriate or not is not the issue for this Court. The issue is if Arbitrator Suardi's interpretation of the law to apply the adverse inference was "completely irrational or manifests a disregard for the law." *See Hoffman*, 236 F.3d at 461. Here, Arbitrator Suardi concluded Mwenelupembe and Davis were available and still employed with Plaintiff on the hearing dates. Plaintiff had the burden of proof and did not call Mwenelupembe and Davis as witnesses. Arbitrator Suardi found that based upon the testimony and evidence, they had information regarding the events that led to Miller's termination and inferred that had they been called, the testimony adduced would have been adverse to Plaintiff. The Court finds that Arbitrator Suardi's decision to apply an adverse inference based on his interpretation of the law for these reasons is not irrational or a disregard for the law. Therefore, the Court finds that

13

Plaintiff has not stated a sufficient basis for vacating the arbitration award because of the adverse inference applied.

Public Policy

Plaintiff also argues that the public policy exception is applicable here and supports vacatur of the arbitration award.

The Supreme Court has provided detailed and explicit guidance regarding the scope of public policy review. *See, e.g., W.R. Grace and Co. v. Local Union 759*, 461 U.S. 757, 766 (1983). In *W.R. Grace*, the Supreme Court held that courts invoking public policy to overturn arbitration awards must be careful to rely on public policies that are "well defined and dominant" and that can be "ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Id.* (quoting *Muschany v. United States*, 324 U.S. 49, 66 (1945)). The Court later clarified the narrow scope of public policy review in *Misco.* 484 at 42. In *Misco*, an employee that ran a dangerous machine in a papermill was caught by police in the company parking lot in a car with marijuana smoke filling the air and a lighted marijuana cigarette in the ashtray. *Id.* at 33. The company discharged the employee for violating a company rule that prohibited employees from bringing and consuming intoxicants or narcotics on its property. *Id.* Finding the evidence insufficient to establish that the employee had used or possessed marijuana on company property, the arbitrator upheld the employee's grievance and ordered the company to reinstate the employee. *Id.* at 34. The district court reversed the award and the Fifth Circuit affirmed, holding that reinstatement would violate the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." *Id*. at

14

34–35. The Supreme Court reversed, finding that the Fifth Circuit had failed to establish a public policy violation. *Id.* at 45.

First, the Supreme Court found that the Court had not drawn its conception of a public policy from existing laws, but relied on its own interpretation of the public interest. *Id.* at 44. Second, the Court held that even if a public policy was established against the operation of dangerous machinery by persons under the influence of intoxicants, the Fifth Circuit had engaged in impermissible factfinding in order to find a violation of that policy. *Id.* at 44–45. Specifically, the Court concluded that the Fifth Circuit had necessarily, but inappropriately, inferred that the employee had in fact used drugs on company property and would do so again in the future while operating dangerous machinery. *Id.* Because the arbitrator had made no such findings, the court of appeals overstepped the bounds of its authority to vacate the award on public policy grounds. *Id.*

Plaintiff contends that public policy is violated by reinstating Miller to her former position as a Qualified Trainer because she poses a significant risk to the public and her potential in the future to fail to train new employees appropriately and create inaccurate documents concerning the qualifications of employees is in violation of FDA regulations, which requires that:

> Each person engaged in the manufacture…of a drug product shall have the education, training, and experience…to enable that person to perform the assigned functions. Training shall be in the particular operations that the employee performs and in current good manufacturing practice…as they relate to the employee's functions. Training in current good manufacturing practice shall be conducted by qualified individuals on a continuing basis and with sufficient frequency to assure that employees remain familiar with CGMP requirements applicable to them.

21 C.F.R. § 211.25.

15

Likewise, FDA regulations establish that maintenance of accurate, truthful production records is required to comply with the United States Federal Food, Drug, and Cosmetic Act. 21 C.F.R. § 211.180.

In support of its position, Plaintiff heavily relies on cases where the regulations or laws explicitly forbid or restrict an employee from returning to work after the violation was committed. *See, e.g.*, *Delta Airlines, Inc. v. Air Line Pilots Assn. Intl.*, 861 F.2d 665, 674 (11th Cir. 1988), *cert. denied* 493 U.S. 871 (1989) (reversing arbitration award that reinstated a pilot who flew while drunk and finding that no state allows operation of an aircraft while intoxicated), and *Union Pacific R.R. Co. v. United Transp. Union*, 3 F.3d 255, 265 (8th Cir. 1993) (finding railroad employee's reinstatement a public policy violation because of safety concerns and placing the railroad at risk of violating the Federal Railroad Administration regulations that explicitly impose restrictions before an employee may be reinstated after an alcohol use violation).

Although it is certainly public policy to have safety procedures in place, as Arbitrator Suardi acknowledged in his findings, he found Plaintiff accepted and allowed supervisors to disregard certain safety procedures. Specifically, Arbitrator Suardi found that based on the evidence presented, Plaintiff engaged in a common practice of allowing its employees to forego the SOPs on training new employees, especially during the third shift, because it was short-staffed. He concluded that Miller's actions to sign off on documents and to train employees in a manner contrary to the actual process for OTJ training was based on Plaintiff's own instructions. Arbitrator Suardi made no finding that Miller would disregard the proper training procedures in the future if Plaintiff enforced those procedures. In fact, enforcing the award should encourage

Plaintiff to enforce the accurate training procedures and not allow for the common practices of its employees to be outside those standards. Unlike in the cases cited by Plaintiff, nothing in the FDA regulations or legal precedent it cited forbid an employee from returning to his/her position after violating a training procedure condoned by the employer. Plaintiff's decision to engage in shortcuts on training procedures is a result of its own making, and it would be outside this Court's authority to infer that Miller would engage in training procedure violations in the future. Therefore, the Court finds that the arbitration award is not against public policy and will enforce Arbitrator Suardi's award.

## Conclusion

Based on the foregoing analysis, Defendant's Motion for Summary Judgment will be granted, and Arbitrator Suardi's Opinion and Award will be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [ECF No. 23] is **GRANTED,** and Plaintiff's Motion Summary Judgment [ECF No. 22] is **DENIED**. The Arbitrator's Opinion and Award is **AFFIRMED**, and Plaintiff is ordered to comply forthwith.

**IT IS FURTHER ORDERED** that the jury trial set in this matter on January 27, 2025, is **VACATED**.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 12th day of September, 2024.

                                           **JOHN A. ROSS**
                                           **UNITED STATES DISTRICT JUDGE**